As soon as I start talking, my nervousness lessens. Does that mean that I have the ability, standing in front of you, to remember all the cases you're going to ask me about and all the medical records and do an effective job? We're sure that you'll do a beautiful job. What's happening with Jeannie Eckwertzel's Social Security claim is the administration has taken a one-time, my anxiety is lessened, and said that's specific legitimate reasons to ignore the treating physician's opinion that I'm not going to have the ability here to work and do my work. Who you call the treating physician is the psychiatrist, correct? Dr. Driscoll, yes. Dr. Driscoll saw the patient on one occasion? Yes. And what did he prescribe as treatment for her as a treating physician? I think it's a she, and she prescribed Cymbalta, which is an antidepressant. She ordered blood tests to make a diagnostic decision, and she asked her for a follow-up in three to four weeks. I thought the patient saw Dr. Driscoll twice, not once. I don't know if there was treatment, and from the records I can't tell you if there was treatment at the second time. I only have treatment records. But the question was, how many times did the patient see Dr. Driscoll? Twice. Okay. But in terms of treatment, that was the reason to see her. The patient sees the doctor in September, probably September 9 of 2005. Correct. He sets the date on the report. And the court hearing is scheduled for October 23. For the administrative hearing, yes. Administrative hearing. Right. And so the doctor gives a report for the September 9 report, all of the things that she determined and what she would recommend and all that stuff. Then I think the plaintiff testified that she then went back to see the psychiatrist. Yes. And apparently just to see how she was getting along on the medication, there was no further study or anything else that went on at that time. I don't have office notes, and I didn't represent her at the underlying hearing, so I can't. No medical records of anything at that second thing. I agree. That's the plaintiff's testimony at the hearing. I agree. And the doctor did fill out forms in October. So at least on two occasions the doctor addressed the issue of this claimant, of genie acquisal. Well, this depression goes back a number of years, I think. To 2001. Pardon me? To 2001. But it's only just a month before the hearing, the administrative hearing, that the plaintiff sees the psychiatrist and was recommended to the psychiatrist by whom? She was recommended, according to the records, by Social Security. This is at 2-30. Her neighbor, her sister, a doctor at the co-op, Dr. Snyder, who was a DO who was treating her for depression, had for a number of months. And also the Social Security, I think it's representative. It says advocate, but she had a non-attorney representative at the hearing level. Did the psychiatrist say anything in her report about, is there any indication that this might have been a visit to try to get some evidence for the hearing that's upcoming next month? I don't think so at all. I don't think it's a report. I think that's the doctor's office notes. It's set forth in the standard office notes procedure. Here's why they're presenting past history, current presentation, and finally treatment at the end. So I think she's a treating physician. She was seen for treatment. Why does it happen a month before the hearing? I don't know. This woman had depression. The ME at the hearing testified it was severe, had been since 2001. She'd been on and off medications for different reasons. She'd been treating with her, the DO, who had been prescribing medications, trying to get her on some medications for depression. And she says Snyder, the DO, as well as the Social Security advocate sent her there. And the reason she was sent there by the Social Security representative was self-destructive pattern. I mean, she's talking suicide. There are representations that she considers smoking a slow form of suicide. She has daily suicidal ideations. Then she doesn't. It's not daily. And you've got a Social Security representative who is watching treatment occur from the DO. And he says, excuse me. And it's a severe impairment. But the question is, is it so severe that precludes her from doing some work? She can't return to her past relevant work. Well, I think that's true, and I think where that goes is the doctor has said, as I tried to start off my example with, that she does not have the ability, the mental ability, to go through with the work. And so if you review the records and say there's a basis for the doctor's decision and there are no clear and specific reasons to reject Dr. Driscoll's opinions, which were also supported by the social worker who was providing treatment in the same mental health facility as Dr. Driscoll.  Harrington. Harrington. And so when you look through their findings, the findings they had that supported the conclusion they came to were that she stayed home in a dark room. She forgot appointments. There's consistent records in there. She called bawling. I missed my appointment today. She got put at the end of the list. She didn't have any taste with food. She wanted to die. She feels like a failure. She had little or no energy. She can't get along. She couldn't get along with her two best friends. She had a falling out. And what happens is, although those are findings that Harrington and Dr. Driscoll rely on, to say she is disabled. Let me ask you this. I think the only point of disagreement between Dr. Driscoll and Dr. Gregg, who testifies at the hearing, is really not as to whether she has depression or even as to whether it's severe. Dr. Gregg agrees that it's severe. I think the only point of disagreement is the number 25, that is to say for the GAF. At the hearing, Dr. Gregg says, well, a 25 requires hallucination or some sort of psychosis. Is that correct? In terms of the diagnostic criteria? In terms of the diagnostic, that is one side of it. And the other one is a serious vegetative state. I mean, you are just unable to hardly do anything. Yes, I would agree. Let me ask you. I want to make sure I've got the answer straight. Because I looked and I couldn't find it, and I confess I didn't do my own research into the diagnostic manuals. But Gregg seems to think that if you don't have hallucination or psychosis, you can't get a 25. That's not correct. That's not correct? And it's in the briefs, the footnote to 25. It's rather severe. But the records and the arguments are correct. That's a day snapshot when the 25 comes in. So to say she's 25 a month before and a month after. But, no, what I'm interested in is you can get a 25 if you are nonfunctional. You don't need to be psychotic. You don't need to have hallucination. I think that's accurate. Yes. Let me ask you about a different question than the depression and the severity. I noticed that during the hearing, the hearing test records were not in front of the administrative law judge. They were coming in later. Correct. I also noticed that the hypotheticals that were posed to the vocational expert kept coming back with one of the available jobs was or a cluster of available jobs were operating as sort of a telephone receptionist or telephone operator and so on. Yet it's very clear that she has hearing impairment. Dr. Driscoll herself refers to it in her diagnosis. And we get testimony from the patient that the probable reason she got fired from her job working in the veterinarian's office is that she couldn't hear properly and she kept making appointments for the wrong day. Right. What are we supposed to do with that, then, in terms of all the jobs that are supposedly available to her when, in fact, there's pretty clear evidence in the record that her hearing will prevent her from doing those jobs? I agree exactly. And I think, in addition, the problem with hearing needs to be applied into the listings of 302 and 1204, the mental and the breathing problems. Because when you're close, when she meets those, she has elements under both listings. She closely equals 302. But when you have a combination of those impairments, you need to be considering all the impairments, including the hearing. And what happens is she's coming in with respiratory problems and she can't breathe, she's got low energy, which is a lot of the same symptoms that you have in depression. And on top of that, she can't hear. How does that affect her self-esteem and social functioning under 1204? Now, we're about to run you over, but I want to ask a version of the same question that both Judge Bea and Judge Thompson were asking. It may be that Dr. Driscoll qualifies technically as a treating physician, but it's also true that the diagnosis that we're looking at results from the first meeting that Dr. Driscoll ever had with this patient. So what do we do with that? Here's what I think. First of all, if there was something sinister or suspicious, then you could look deeper. But do you know what? Most diagnoses are made on the first appointment. If the doctor's any good, they're capable of doing that and deciding the course of treatment, adjusting it as time goes. Second thing is... Was there any adjustment or different treatment in the second meeting? I have no records of the second one. I didn't do the hearing, so I have no independent information about anything. The only treatment given her was an antidepressant drug? The antidepressants, they were doing a blood level for a test. She wanted to test her to rule out something, and then she wanted the follow-up in three to four weeks. The only treatment given her, treatment, was antidepressant drug testing, was blood tests. Next was follow-up, and you can't point out to any treatment that was given differently in the follow-up than in the antidepressant drugs which were originally given. That's correct. Except the reference from Driscoll to the fact that she was treating with Harrington, which the doctor felt some comfort in, in terms of the suicidal ideation, that she was continuing to get counseling. Why don't we have the government, and then we'll give you a minute to respond. Thank you. Thank you. Good morning. May it please the court. Joanne D'Antonio on behalf of the commissioner. I'll address what appears to be one of the issues that the court is struggling with this morning, and that is the status of Dr. Driscoll. It's not Dr. Driscoll's diagnosis of depression that is worrying. It is Dr. Driscoll's assessment later following her first examination or evaluation of the plaintiff that is worrying, where she indicates that she has these severe and extreme limitations and that she has a global assessment of functioning of 25. And that is very severe. 25 indicates that she basically either has hallucinations, has paranoia, or is in a vegetative state where she really can't function. And that's not what the record shows here. What does really can't function mean? We have a fairly detailed description of what she actually does. So put 25 to one side for just a moment. She describes pretty clearly what her daily routine is. She describes her work history. She describes her human relations history. And you're just saying that that's not a 25. Well, I do have that within the briefing. It shows behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment. Example, sometimes incoherent, acts grossly inappropriately, suicidal preoccupation, or inability to function in almost all areas. Example, stays in bed all day, no job, home, or friends. She doesn't stay in bed all day, despite her testimony. She is responsible for taking care of a neighbor's daughter, getting her off to school and bringing her back. She's responsible for doing the same thing with her niece. So she leaves the house. She goes to church. She does socialize. She does have fights with her friends. She was unable to get along with her sister for a while, so had to move out and go to her aunt's, but they reconciled. She came back. She speaks with her aunt on a daily basis. So this is not a woman who is sitting in her bedroom lying in bed with the blinds closed all day long doing nothing. That's just not happening. And if the number were, and I'm making these up, if the number instead of 25 were 40, then what happens? It's more moderate symptoms, and I can't put my fingers on that. Does your case rise or fall on whether the number 25 is right or wrong? Absolutely not. What the ALJ was looking at was these inconsistencies within Dr. Driscoll's opinion. First off, with her opinion, she did absolutely no examination, mental status examination like Dr. Hurd did, had her do serial sevens or something to test her. She did absolutely nothing. Her records are essentially this is what Ms. Eckworth said was going on. And so what the ALJ was looking at is Dr. Driscoll says she's this 25, she's in this vegetative state, but Dr. Gray is saying, well, that's really bad. Gray or Greg? Greg, I believe. I think Gray in the transcript, but yeah, okay. The name that begins with GR. Yes.  And just looks at the inconsistencies between that and the testimony and also looks at the inconsistencies in Dr. Driscoll's, what her residual functional capacity assessment is, is that Ms. Eckworth has all of these awful severe limitations, but then on the last page indicates that, yes, she can go to work. So there's just these inconsistencies. I'm sorry, the last page. I'm sorry, not last page. This is not your fault, right? Somehow I just lifted off the water and didn't follow you there. I'm sorry, on page 245, there's two sections. There's Dr. Driscoll's examination, if we can call it that, and then there's this medical source statement that was done by herself and the counselor. And on 245, it asks whether or not Ms. Eckworth could do any work on a regular and continuing basis, and although Mr. Harrington says no, Dr. Driscoll writes in yes, saying that she could, and then somehow talks about how she considers depression to be a medical, not just a mental. And this is completely inconsistent with all these marked limitations that she has. The ALJ also looks at the fact that, and I think that what's argued by the writer of the brief, whether she's treating or not treating, really is immaterial.  Mr. Harrington puts an X in the no. The question is, I'm sorry, in your medical opinion, given Ms. Eckworth's mental condition, could she work on a regular and continuing basis, meaning eight hours a day, five days a week, in any job, yes or no? Harrington marks no and writes, with her emotional disorder and medical problems, she is not capable to do regular work on a continuing basis. Then in Dr. Driscoll's handwriting, the yes is not checked, but she writes, yes, comma, I consider major depressive order a mental condition, but also a medical problem. Well, I couldn't tell whether yes is to say, well, wait a minute, the question says mental condition, and she then says, but it's not just a mental condition, it's also a medical problem. I find that somewhat opaque. I see the yes, and it could be, yes, she can do the work, but the follow-up from the yes isn't responsive to that question, really. I know. And so when we look at the ALJ's decision, that is one rational interpretation, and the court upholds it based on that. This conflict between whether Dr. Driscoll is a treating physician or a non-treating physician is fairly immaterial, because in either case, because there's contradicting opinions between Dr. Grech and the other state agency physicians, it only needs to be rejected for specific and legitimate reasons. What other physicians were contrary to Dr. Driscoll's? Well, there was three state agency physicians who did a review of the record, including the whole record, including Dr. Hurd's mental statics examination, and those were Dr. Patin. Excuse me, Dr. Hurd was a psychiatrist? He was, actually, no. He did her physical, but he also conducted a mental status examination and had her go through serial sevens and tested her on. Does that have qualifications to do a mental status examination? That is typically included in a regular general physical examination. The idea with a mental status examination is there's certain tests that they run through where their ability to subtract in serial sevens, going from 100, going down. But he doesn't render any... Hurd is a general medical doctor? Either that or he's an orthopedist. I'm not sure. But he's not a psychologist or a psychiatrist. But that doesn't preclude him from doing the mental status, and he doesn't make any opinions based on that. He just annotates what he's found, that she did have some problems, but she's still able to do it. She does have a little concentration problems. Well, there was also two other state agency physicians that reviewed Dr. Bateen's findings and concurred with those, and there was also Dr. Graves, the medical expert, who also testified. Other than that, there is no other psychological evaluations in the record. He is a... I believe it's... I'm going to misspeak. I can't remember if he was a psychiatrist or a psychologist. I'm sorry. I think so. I think so. He's a doctor in the sense of Ph.D. Right, right. So there really isn't much in here. There's not a whole lot in the record that shows that she has, as far as examinations go, that she has. What do we do with the finding of the ALJ that he finds Eckwurzel, quote, partially credible?  That goes to Dr.... I don't understand what that means. Is it an adverse credibility finding, or is it a... It's a half and half. To some degree, he is finding that she is credible, that she does have some problems. She has some depression. She does have some problems with social functioning. Yes, she has COPD. She does have breathing problems. Yes, she does have some minor aches and pains. She has some problems that come in from time to time. But to the point where she indicates that I'm disabled, I cannot do anything, I can't go back to work because of my physical and mental, he finds that not to be entirely credible. Can you make a distinction between she's partially credible as to some symptoms and not credible as to others? He doesn't make a very specific finding on that, no, Your Honor. What do we do about the hearing issue that I raised? I won't repeat the question because you heard what I said. I did, and I have to admit that I'm not completely able to give a very intelligent answer on that because I didn't prepare that. Well, it's right there in front of us. That is to say that I will repeat the question. In her testimony, she says she had a job as a receptionist in a veterinarian's office, and she was eventually, this wasn't her word, but she was eventually canned. And the question was why. And she says, well, I think it was because I kept not hearing very well and writing down the wrong appointment times for everybody, and he finally let me go. We also know that she's got severe hearing impairments. The ALJ at the time the hearing is completed doesn't have those actual tests. The record stays open to let them come in. Now, I don't know why he doesn't have those, but he doesn't. The hypotheticals given to the vocational expert don't include she can't hear very well because the vocational expert keeps coming back saying she can do all these jobs on the telephone. It actually does include a hearing impairment. It includes that she's not able to hear with background noise. And there is evidence in the record from Dr. Hurd who indicates, although she does have a hearing impairment, she is able to hear me. So I think that that was taken into consideration, and that was put in the loan. I don't think it was in that in the sense that she has trouble taking things on the telephone and getting them accurately. And we don't know, and that's part of the credibility issue. I mean, the doctor never told her why she wasn't very good. She surmised that was it. Basically, yeah, the vectors basically said you're not working out. We don't know. But from what there was in the record, she does have a hearing problem that appears to be related to background noise. That was included in the hypothetical. The VE considered that and was able to come up with these jobs and said that these fit. I have to say my problem with this one, this is a real close one for me, is that it just seems that it was a little too quick and sloppy, and I'm not confident that the ALJ had in front of him and then posed accurately to the vocational expert the full range of this woman's actual problems. I'm over time. I don't know how to respond to that globally other than that typically has not been raised as an issue. There's nothing really specific that's been raised. The credibility finding of the ALJ was done and was appropriate. The evaluation of the medical evidence was appropriate. As to what? As to what her limitations were. I mean, there has to be some medical evidence. You can't rely solely on what her personal complaints are, what her subjective statements are only. And you have to rely on what the medical evidence is. And the medical evidence doesn't support anything higher than what was already within the residual functional capacity. Would you like a minute? I would like just a minute, and I'll cut what I was even thinking about presenting. The easy way to deal with the hearing issue, as they do with any post-medical issues that raise additional limitations, they'll do a post-hearing interrogatories. The ALJ can send out post-hearing interrogatories. Send them to counsel for approval or comments, accept or reject. Send those interrogatories on to the VE and say, oh, we've got some additional information. The second part of the hearing issue that goes to credibility is when she says, I can't hear on the phone, and that's why I get fired. And the judge says, I don't believe she's credible. And now you have records showing, yes, she can't. Hearing on the phone would be a problem for her. That should bolster her credibility, but we cannot tell, because of the way credibility was determined in this case, whether or not he considered the hearing issue in the credibility determination. Thank you. Thank both of you for your helpful arguments. The case of Eckwurzel v. Asher is now submitted for decision.
judges: Thompson, Fletcher, Bea